IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION


- - - - - - - - - - - - -X
UNITED STATES OF AMERICA,  :
                           :
      Plaintiff,           :
                           :
vs.                        :          Case No. 4:20-cr-00212
                           :
ABRAHAM CHRISTOPHER SMITH, :   SENTENCING HEARING TRANSCRIPT
                           :
      Defendant.           :
- - - - - - - - - - - - -X


                         Courtroom, First Floor
                         U.S. Courthouse
                         123 East Walnut Street
                         Des Moines, Iowa
                         Tuesday, October 19, 2021
                         10:02 a.m.


BEFORE:  THE HONORABLE STEPHANIE M. ROSE, Judge.


APPEARANCES:

For the Plaintiff:        ADAM J. KERNDT, ESQ.
                          United States Attorney's Office
                          U.S. Courthouse Annex
                          110 East Court Avenue, Suite 286
                          Des Moines, Iowa  50309


For the Defendant:        NICHOLAS A. SARCONE, ESQ.
                          Sarcone Law Firm PLLC
                          501 Southwest Seventh Street, Suite J
                          Des Moines, Iowa  50309


                KELLI M. MULCAHY, CSR, RDR, CRR
                   United States Courthouse
                123 East Walnut Street, Room 115
                   Des Moines, Iowa 50309

I N D E X

VICTIM IMPACT STATEMENT                                        PAGE

L.O.                                                           13

E X H I B I T S

GOVERNMENT'S EXHIBITS                         OFFERED  RECEIVED

1 - Video and image files                          6         6

1          P R O C E E D I N G S

2               (In open court, with the defendant present.)

3               THE COURT:  Thank you.  You can be seated.

4               We are here in the matter of United States vs. Abraham

5    Christopher Smith.  It's Case No. 4:20-cr-212.  The United

6    States Probation Office is represented by Connor Perry.  The

7    U.S. Attorney's Office is represented by Adam Kerndt, and he is

8    joined by FBI/DCI Task Force Officer Chris Thomas.  The

9    defendant is personally present and represented by his attorney,

10   Nick Sarcone.

11              Mr. Smith, do you recall being in court in June of 2021

12   and pleading guilty to Count 1 of the indictment that charged

13   you with enticement and attempted enticement of a minor?

14              THE DEFENDANT:  Yes, Your Honor.

15              THE COURT:  Okay.  And I assume you recall that this

16   offense is punishable by at least ten years and up to life in

17   prison, at least five years and up to life on supervised

18   release, a fine of up to $250,000, and a $100 special

19   assessment.  Do you remember those penalties?

20              THE DEFENDANT:  Yes, Your Honor.

21              THE COURT:  And you understand you're here today to be

22   sentenced?

23              THE DEFENDANT:  Yes.

24              THE COURT:  Okay.  I have received and read the

25   Presentence Investigation Report.  The most recent report is

1   dated October 8th of 2021, and it's filed at Docket 51.  I have

2   also read and considered the sentencing memorandums filed in the

3   record at Dockets 52 and 53, the victim impact statement that

4   was submitted by the victim's parents.

5          And I have reviewed the contents of Government's

6   sentencing Exhibit 1, which includes all of the video and image

7   files that law enforcement located on the defendant's Private

8   Photo Vault application on his iPhone.  That included 11 files

9   related to the minor victim in this case and then 11 additional

10  files of sexual nature that were not related to the minor victim

11  in this case.

12         Mr. Kerndt, did you have an opportunity to review the

13  presentence report in this case?

14         MR. KERNDT:  Yes, Your Honor.

15         THE COURT:  And the defendant has objected to the

16  increase or the cross-reference under 2G1.3(c)(1).  Aside from

17  that issue and a determination of the ultimate sentence to be

18  imposed here, anything else to be resolved for the Government

19  today?

20         MR. KERNDT:  No, Your Honor.

21         THE COURT:  Okay.  Mr. Sarcone, did you have a chance

22  to review the presentence report with your client?

23         MR. SARCONE:  I did, Your Honor.  I reviewed the

24  Presentence Investigation Report with my client at the Polk

25  County Jail.

1          THE COURT:  And aside from those issues that I just

2     outlined with Mr. Kerndt, anything else to be resolved for your

3     client today?

4          MR. SARCONE:  No.  I just would like to note, and we

5     can clear this up initially, that we do stipulate -- in

6     Government's sentencing memorandum, page 7, this is Docket 53,

7     there are three bullet points which identify the file names in

8     the exhibit submitted.  We do stipulate that those are correct,

9     Your Honor.

10          THE COURT:  Okay.  Thank you.

11          Mr. Smith, did you have enough time to review your

12     presentence report with your lawyer?

13          THE DEFENDANT:  Yes, Your Honor.

14          THE COURT:  Was he able to answer whatever questions

15     you may have had?

16          THE DEFENDANT:  Yes.

17          THE COURT:  Have you been happy with him as your

18     lawyer?

19          THE DEFENDANT:  Yes.

20          THE COURT:  Okay.  Good.

21          Then let's talk about that cross-reference.  This

22     appears to be purely a legal interpretation question.  There

23     aren't any disputes about the facts, which are outlined very

24     thoroughly in the Presentence Investigation Report.  The

25     Government, obviously, bears the burden of establishing this

1    adjustment by a preponderance of the evidence.

2            Mr. Kerndt, do you have any additional evidence or

3    argument you'd like to present?

4            MR. KERNDT:  Yes, briefly, Your Honor.

5            First, the Government would move to be admitted under

6    seal Government's Exhibit No. 1.

7            THE COURT:  Any objection?

8            MR. SARCONE:  No, Your Honor.

9            THE COURT:  Government Exhibit 1 is admitted under

10   seal, but I am going to have the Government maintain custody of

11   that.  I'm going to return it to the Government, given that it

12   contains child pornography.

13                        (Government Exhibit No. 1 was

14                          offered and received in evidence.)

15           THE COURT:  Go ahead, Mr. Kerndt.

16           MR. KERNDT:  Thank you, Your Honor.

17           The question here is whether one of the defendant's

18   dominant purposes in engaging in the sexually explicit conduct

19   was to produce a visual depiction.  I believe that the Eighth

20   Circuit law laid out in the Government's sentencing memo

21   indicates that with the evidence in front of the Court that this

22   burden is met by a preponderance of the evidence.

23           I won't restate everything that's in my sentencing

24   memo; however, I do want to focus the Court on the *Fortier* case.

25   In the *Fortier* case, which is an Eighth Circuit case from 2020,

1   it examines this exact issue, and in the *Fortier* case, the

2   Eighth Circuit said that, you know, the evidence certainly shows

3   something beyond a recording by accident.

4         I'm not suggesting that a recording by accident is the

5   standard here, Your Honor, but what the Eighth Circuit looked at

6   in *Fortier* were a couple categories of evidence that the

7   Government put forth in that case, and they found that it was

8   sufficient to meet the Government's burden.

9         The first category of evidence that they put forth in

10  that case were other recordings evidence.  Just like in *Fortier*,

11  here we have other recordings evidence.  We have a variety of

12  different files that are saved in the Private Photo Vault app,

13  both of Child Victim No. 1, the victim in this case, as well as

14  other sexually oriented files, videos, and images of another

15  adult with which the defendant was sexually involved.

16        In addition, like the *Fortier* case, here we have

17  additional facts that suggest that the defendant's purpose -- at

18  least one of his predominant purposes was to create visual

19  depictions of Child Victim No. 1.  In *Fortier*, they talked about

20  the camera angles used on the actual video in question.  They

21  talked about adjustments of the camera.

22        Here the video in question is very clear, in my mind,

23  that the defendant was seeking to capture the conduct in the

24  fashion that he wanted it captured for his future enjoyment.  He

25  moves the camera to obtain the best picture of the minor.  He

1  takes a 75-second video.  And I would note for the Court that

2  the video is of a similar vantage point of another video in the

3  secret photo vault app.

4        Based upon all this, Your Honor, we do believe that by

5  a preponderance of the evidence the Government has shown that

6  the defendant acted with a predominant or a dominant purpose of

7  being to obtain a visual depiction.

8        There is no guidance or requirement in the Eighth

9  Circuit that one has to have this purpose in mind far in advance

10  or that one has to have this purpose in mind before any sexual

11  contact begins, and so based upon what the law is currently in

12  the Eighth Circuit, we would ask that the Court apply this

13  cross-reference.

14        THE COURT:  Thank you, Mr. Kerndt.

15        Mr. Sarcone.

16        MR. SARCONE:  Thank you, Your Honor.

17        I think the Government's right the standard is not

18  mistake, and the dominant purpose language has to mean

19  something.  The Government does not dispute the facts of how

20  this encounter happened, and to the extent -- without getting

21  into the details of the videos, to the extent they capture

22  similar things, there were similar things happening.

23        The *Fortier* case, as I recall, without having it in

24  front of me, dealt specifically with posing, moving camera,

25  switching angles, things of that nature.  The particular

1  similarities here, in our view, are much more coincidental to

2  the act that was occurring as opposed to indicating some

3  particular purpose for that.  The fact that there were a few

4  other videos in and of itself is not, in our view, sufficient to

5  show a dominant purpose.

6         Particularly, in the Government's view, there was a

7  prior act that had occurred where nothing had been video-

8  recorded or anything like that.  Anytime it would occur

9  spontaneously or be something that just occurred during the act,

10 in the Government's view, that would be sufficient, based on how

11 they've argued it, and we believe that that's not correct.

12        We believe that the Fourth Circuit has the better

13 interpretation, at least insofar as it explained more thoroughly

14 what a dominant purpose is, whereas in, you know, the Eighth

15 Circuit, case law does leave a little to be desired in

16 explaining it.

17        But it would be our position, as we argued in the

18 brief, that the cross-reference does not apply because it was

19 not a dominant purpose of the conduct on that evening.

20        THE COURT:  Thank you, Mr. Sarcone.

21        In this case the cross-reference at issue applies where

22 the offense involved a defendant who causes or permits a minor

23 to engage in sexually explicit conduct for the purpose of

24 producing a visual depiction of such conduct.

25        As Mr. Kerndt has discussed in both his brief and here

1  this morning, the guidelines explicitly state that this is to be

2  construed broadly, and the Eighth Circuit has interpreted in

3  illustrative cases similar language and found that sufficient

4  proof that there is a dominant purpose for creating the

5  depiction of the acts with the minor is sufficient here.

6        So the video doesn't have to be the sole or even the

7  primary purpose for encouraging the minor to engage in the

8  sexual contact.  Dual or even, I would guess, triple purposes

9  are sufficient.

10       But here I do find by a preponderance of the evidence

11  that there was a dominant purpose of the defendant in using this

12  victim to create this visual depiction, and here's why:  As is

13  established in Government sentencing Exhibit 1, Defendant

14  appears to have an active and repetitive interest in documenting

15  his sexual encounters through videography on his telephone.

16       From October 9th of 2020 to October 29th of 2020, the

17  defendant exchanged more than a thousand text messages with his

18  minor victim.  A large portion of these messages were sexual in

19  nature, and there are messages within this chain that very

20  explicitly detail the defendant's interest in this exact sex act

21  using these exact body positions, using the exact facial

22  expressions of this minor during this video.

23       This isn't a sex act that has to be performed in a

24  particular position, and that's borne out by some of the other

25  videography the defendant has.  This is one where the defendant

1  told this child his fantasy and the two of them reenacted that

2  fantasy in a very deliberate and explicit and careful manner,

3  and the defendant documented that using his phone.

4        The defendant had certainly telegraphed to this child

5  how much he enjoyed video evidence of sexual content, and, in my

6  view, those are the things that tip this into the preponderance

7  of an evidence standard being established.  And I don't think

8  this was something that happened spontaneously because of the

9  way it so carefully mirrors the defendant's outlined fantasy

10  with this child and because of the other Government Exhibit 1

11  evidence that would indicate the variety with which this act can

12  be performed and the defendant's exacting nature in setting it

13  up the way it happened on this particular night that it was

14  videoed.

15        So I will here apply the cross-reference.  With that, I

16  then adopt the guideline calculation contained within the

17  Presentence Investigation Report.  That starts at a base offense

18  level of 32.

19        There is a two-level increase because the offense

20  involved a minor who was between the ages of 12 and not yet 16.

21  There is a two-level increase because the offense involved the

22  commission of a sex act.  There is a two-level increase because

23  the minor was in the custody, care, or supervisory control of

24  the defendant.  There is a two-level increase because the

25  defendant solicited the participation with the minor in sexually

1  explicit conduct.  There is a five-level -- I'm sorry -- there

2  is a Chapter 4 increase because of the series of sexual

3  behaviors that occurred here between the defendant and the minor

4  victim.

5          There is then a two-level reduction for acceptance of

6  responsibility.

7          Is the Government moving for that third level as well?

8          MR. KERNDT:  Yes, Your Honor.

9          THE COURT:  So we have a Total Offense Level 42.

10  Defendant is a criminal history category of I, which gives us an

11  advisory guideline range of 360 months to life.  Probation is

12  precluded by statute.  Supervised release of five years to life

13  is applicable.  The fine range here is 50,000 to 250,000

14  dollars, although I don't intend to impose a fine.  I'll ask

15  about restitution in a moment here.  And there is a $100 special

16  assessment.

17          Mr. Kerndt, let's talk first about restitution.  The

18  victim impact statement from the victim's parents does describe

19  a number of losses financially that the family has sustained as

20  a result of this particular offense, but, as I understand it, no

21  restitution has been requested.  Is that right?

22          MR. KERNDT:  That is correct, Your Honor.

23          THE COURT:  Okay.  Are there any victims or family

24  members who wish to be heard before I impose sentence in this

25  case?

1           MR. KERNDT:  Yes, Your Honor.

2           THE COURT:  Okay.  And, ma'am, I'm just going to have

3   you introduce yourself using your initials, please.

4           MS. O.:  Yes.  L.O.  I am the mother's parent --

5           THE COURT:  Okay.

6           MS. O.:  Or the, excuse me --

7           THE COURT:  The victim's parent.  Yes.

8           MS. O.:  The victim's parent.

9           THE COURT:  Go ahead.

10          MS. O.:  We were asked to write a victim impact

11  statement on how the defendant's actions have affected our child

12  and family.  This has torn up our lives.  He has torn up our

13  lives.

14          Every day in our house is a struggle.  Our greatest

15  fear is that the harm he did to our daughter is irreversible,

16  and we are trying to face that reality and understand what our

17  new normal is.  We are trying to help our daughter navigate

18  through, and hopefully past, these horrific events.  Delivering

19  an impact statement today to the Court is, frankly, an

20  impossible task.

21          Our 15-year-old daughter, 15-year-old daughter, was

22  enticed, groomed, and manipulated into engaging in the sexual

23  intercourse and other sexual activities with her mentor, a

24  so-called trusted teacher.  His role required him to be a

25  mandatory reporter of any crime or action against any victim.

1          We cannot get past -- what we cannot get past is the

2     fact that he served our community in a role of a teacher, a role

3     that automatically elevated him in the eyes of children and

4     parents as a trusted member of society.  How were any of us able

5     to suspect he was molesting our daughter when he showed interest

6     in her?

7          He gave her gifts, including an Apple watch, and

8     supported her intellectually.  He attended her sporting events.

9     He challenged her academically in and out of the classrooms and

10    gave her support and encouraged her to follow her dreams.

11         Our daughter is angry that she fell victim to him.  She

12    has self-guilt.  Because of the defendant, she now suffers from

13    anxiety and depression.  She is medicated.  She has attempted

14    suicide twice that we know of.  Ever growing is her depression,

15    embarrassment, and confusion about how -- her self-worth and how

16    she fits into the world.

17         After the fact, she had to go through a grieving

18    process over losing her mentor, her trusted friend.  To you and

19    me, that doesn't sound reasonable, but our daughter believed she

20    was loved.  Yes, she elevated the defendant as a true loving,

21    kind, and trusted companion.  She was completely unaware that

22    his intentions were beyond selfish.  They were depraved,

23    twisted, and intentionally misleading, all for his

24    gratification.

25         Not ever did he consider how he was systematically

1  destroying the unique individual our daughter is.  He never

2  cared about her.  She didn't understand that she was, in

3  reality, seduced and taken advantage of in the worst possible

4  way.

5          Words to describe our daughter before she was

6  manipulated by the defendant:  confident, intellectual,

7  talented, curious, driven, positive, relentless.  She focused on

8  her future more than most teenagers.  She planned.  She had

9  goals, and she had dreams of greatness and success.  This was

10 our daughter.

11         As a freshman, our daughter ranked in the top ten of

12 her class of over 550 students, achieving straight A's, taking a

13 full course load of mostly advanced classes.  She taught herself

14 Spanish just for fun.

15         And out of the classroom, she excelled in competitive

16 travel softball, mostly playing catcher, and placed as the

17 leadoff batter.  Many times she was invited to play up an age

18 level or two in tournaments.  She sought additional practice

19 time to better herself whenever possible.  She was given the

20 opportunity.

21         She was determined to play collegiate ball while she

22 studied to be a doctor, an engineer, or, frankly, anything she

23 wanted to be.  Since this incident, she has lost the motivation

24 to play the game she loved since he stalked her at the softball

25 fields.

1          She was confident; an individual; a respectful, fun,

2   caring daughter who was absolutely our little girl.  Now try to

3   imagine a 15-year-old child being held in a psychiatric ward,

4   medicated, isolated, only able to see counselors.  She was in

5   the beginning stages of trying to process and accept that she

6   was a victim, that the trauma she was subjected to was real.

7          In the first week she was in an inpatient status on

8   lockdown; no visitors, not even myself or her father.  She was

9   allowed one five-minute phone call a day.  The doctors feared

10  suicide.  The following two weeks were spent with counselors in

11  an outpatient status.  She missed more than a month of school.

12         Excuse me.

13         THE COURT:  You're okay.  Take your time.

14         MS. O.:  Now our daughter has trouble concentrating.

15  She has no appetite, physical or emotional.  She is forgetful,

16  withdrawn, and shows less determination.  She is no longer

17  achieving straight A's.  She is no longer driven to take

18  advanced courses.  She is no longer considering her bright

19  future.  She is surviving one day at a time.

20         After the incident, she never set foot in her high

21  school again.  She also would never go into our home alone and

22  oftentimes waited for us to come home with her car running in

23  the driveway.

24         We took immediate preventative action and emergency-

25  enrolled her into a new school.  This required us to disclose

1   why she needed to change schools, which was difficult.  Then as

2   soon as possible we moved into the new school district.  How

3   could she return to her past life where people would surmise

4   that she was, in fact, the victim of the defendant?  She didn't

5   want to be stared at or gossiped about.

6          We thought our move would save her from that gossip,

7   but that isn't the case.  Somehow someone realized who she was.

8   She is now being targeted and bullied at her new school, calling

9   her names and making reference to the past.  We are distraught

10  not knowing how to help her.  We worry terribly that she will

11  struggle to have a healthy relationship.  In her words just this

12  past weekend, their encounters were grotesque.

13         She's trying very hard to make the best of her new

14  normal, but every day is an emotional challenge.  We have

15  constant fear and mistrust of the new people she encounters.

16  She lost friends.  She tries very hard to fit in when before she

17  was her own person, unique and passionate for life, for family,

18  and friends.

19         How has this affected those who love her, her family

20  and her close friends?  As her parents, we had and continue to

21  have long sleepless nights, afraid she would harm herself, run

22  away, or, the worst fear, that she would be suicidal.

23         I spent many, many nights with her as she slept or

24  tried to sleep, making sure she was safe.  We hid all the

25  medications in our house, even Tylenol and aspirin.  We hid

1 knives, scissors, razors, and belts, especially belts, so she

2 wouldn't be tempted again.

3 　　　　We are angry.  We are angry.  We are very devastated

4 for our child.  We were also affected monetarily.  We took time

5 off from work without pay.  We have thousands of dollars of

6 medical and psychiatric bills.  We sold our home of 16 years

7 quickly.  It was a significant expense for us to move and buy in

8 a highly competitive and inflated housing market.  She no longer

9 felt safe in our home.  How could she since this is where he

10 molested her?  Our home is where he was caught.

11 　　　　We also lost items from our home that were taken into

12 evidence, including her iPhone and laptop.  We had to pay to

13 replace these items since they have yet to be returned to us.

14 　　　　We worry she will lose out on academic and/or --

15 sorry --

16 　　　　THE COURT:  It's okay.

17 　　　　MS. O.:  -- sports scholarships since her ambitions

18 have lessened.

19 　　　　As parents, we are mistrustful.  We want to empower our

20 daughter to make choices, to make mistakes, but also to be safe.

21 We live in fear, constant fear.

22 　　　　I am also in counseling; however, my husband is still

23 in the anger stage and is not yet ready to take that step.  This

24 worries me too.  Our emotions are unpredictable.  We have had

25 bouts of -- we have bouts of depression.  We feel we have failed

1  to protect our little girl.

2         What should be next for the defendant?  We cannot ever

3  trust that this man could become a rehabilitated member of

4  society.  Can you?  Can you trust he won't use his charm and wit

5  and ability to easily manipulate someone else?  He was 24 years

6  older than our child.

7         I heard directly from a friend who is present in court

8  today that his daughter was also approached -- approached by the

9  defendant to go star gazing at Yellow Banks Park, one of the

10 places that he molested our daughter.

11        I also heard from a volleyball parent that shared he

12 had invited the volleyball girls to his room after a match for

13 hot chocolate.

14        On October 29th, 2020, the day the news story broke of

15 his arrest, a female student of his posted online that she had

16 walked out of his class the day before because he, quote,

17 creeped her out.

18        This was not an isolated case, and I hate to imagine

19 how many attempts he made with other girls and how many other

20 victims are out there who are too ashamed to come forward.

21        I'm proud of our daughter.  She came forward.  She took

22 the brunt so that no other victims will be subjected to him.

23 The possibility of releasing him and labeling him someday as a

24 sex offender is incomprehensible to us.  He will just terrorize

25 another child as soon as he finds the opportunity.  He needs to

1  be removed from society until he has no ability to harm another

2  child.  This level of depravity should not be rewarded with

3  freedom ever.

4          We want to end this by saying thank you to the awesome

5  hospital staff who protected and counseled our child, both

6  inpatient and outpatient, for those three weeks.

7          Our sincere thank you to the Altoona Police Department,

8  some of them present today, for acting quickly and diligently

9  when we discovered what was happening to our daughter.

10          Thank you to the STAR Center for giving us resources

11  for counseling to crime victims, for both helping with finding

12  alternative counseling and for finding financial reimbursement

13  opportunities; to our attorneys, both state and federal, for

14  their expertise and patience with explaining this painful

15  process and answering all of our questions.

16          Lastly, and most importantly, is our gratitude and

17  thanks to our family and friends who have been there for us and

18  who will continue with us on our journey of healing.

19          Thank you.

20          THE COURT:  Thank you.

21          I want to say this to you:  Your daughter is still

22  underneath all that's going on, that same confident and

23  intelligent and talented and curious and driven child that she

24  was.  This has been a hellishly long year for your family, but

25  in terms of healing from this kind of injury, this kind of

1   emotional injury that she has suffered, it's only been a year.

2   She has many years ahead of her to help her get past this.

3          You're doing everything as parents that you can

4   possibly do to help her.  She needed psychiatric help.  She'll

5   need counseling for a very long time.  And she may get better,

6   and then when she has her own 15-year-old daughter, she may need

7   help again.

8          It is astounding to me, because we see a lot of cases

9   where kids are taken in by predators, you caught this in three

10  weeks.  That's astounding.  That's by far the fastest I've ever

11  seen a parent catch on to what was going on.

12         And I'm thrilled that the police took this as seriously

13  as they did as quickly as they did.  You were on this as fast,

14  really, as you could have been on this, and you've done

15  everything you can do to help your daughter since this happened.

16         She is still this amazing person, and what she did,

17  what she's going through because of the publicity surrounding

18  this, is horrific.  This would have been hard enough if he had

19  been a regular 39-year-old man.  That he's a teacher and her

20  teacher and that this became as public as it is is heartbreaking

21  for her, but it will fade.  And I know it doesn't feel like that

22  for her, but, unfortunately, we'll have more teachers who do

23  this, and she'll get pushed out of the limelight.  You know,

24  she'll go farther down the Google search, so to speak.

25         And she'll never be the same person she was, but she

1   may actually come out stronger because at some point she's going

2   to realize how strong she had to have been to have gone through

3   this process.  There are husbands and wives who wouldn't want to

4   discuss these kinds of details with the police about each other,

5   let alone an unsophisticated 15-year-old girl having to talk

6   about these very embarrassing, lurid details, knowing that

7   people have seen these videos, knowing that her parents have

8   been involved in having to search her home, her room, and

9   knowing what happened between her and this man.  And she did all

10  that, and she's still moving.

11          So I know this feels impossible to you and your husband

12  right now, but she's very early in this journey, and she will

13  get better.  And I say this often to parents who are in this

14  situation:  To the extent the U.S. Attorney's Office can hook

15  you up with other parents, I think you are your own best group

16  of therapy because all of you are feeling similar reasons of

17  guilt.  And if you heard each other's stories, you would never

18  hold that parent accountable for what happened, never.  It

19  wasn't your fault.  It wasn't your daughter's fault.  This was a

20  39-year-old man and a 15-year-old girl that was his student.

21  That's not her fault, and she needs to understand that.

22          I hope your husband gets some counseling too.  You

23  absolutely all need it.  There's nothing that makes you weak for

24  getting counseling.  It makes you stronger.  As I say to many

25  defendants here in the courtroom, your mental health is every

1  bit as important as your heart or your lungs or anything else.

2  And if you had a heart attack, if your husband had a heart

3  attack, he'd go to a cardiologist.  There's been a psychic

4  injury here to your family.  You all are going to need

5  professional help, so stay with that.

6       But understand that under all of this, your daughter is

7  going to be okay because she's getting what she needs from you.

8  It's just going to be slow.

9       MS. O.:  It is.

10       THE COURT:  So thank you for being here today and for

11  speaking.

12       MS. O.:  Thank you.

13       THE COURT:  Mr. --

14       MR. SARCONE:  Your Honor.

15       THE COURT:  Go ahead.

16       MR. SARCONE:  I do need to just make a bit of a record.

17  Out of deference to the victim's mother, I didn't want to object

18  during the victim impact statement.  But to the extent that

19  there were allegations of other uncharged conduct or unproven

20  conduct, we would object to that and ask the Court not to

21  consider it.

22       THE COURT:  I'm not considering that in deciding a

23  sentence.

24       MR. SARCONE:  Thank you.

25       THE COURT:  Mr. Kerndt, any additional victims who wish

1   to be heard?

2            MR. KERNDT:  No, Your Honor.

3            THE COURT:  Okay.  What is the Government recommending

4   here by way of an appropriate sentence?

5            MR. KERNDT:  Your Honor, the Government is recommending

6   360 months.  The seriousness of this conduct cannot be

7   overstated.  The defendant was a teacher.  The defendant was

8   entrusted with the nurturing, the educating, and the

9   safeguarding of this child.  The defendant knew, because of his

10  position, her unique vulnerabilities, and he exploited those for

11  his own sexual gratification.

12           This case is not simply limited to the specified

13  in-person acts.  The defendant solicited pictures, videos from

14  the child.  The defendant received those.  He was very happy

15  about having received those, and he produced a video of this

16  child.

17           The callous, callous selfishness with which this

18  defendant repaid the parents' trust truly is an absolute

19  nightmare.  He was her mentor, and the immeasurable harm imposed

20  upon this 15-year-old is significant and will be ongoing.

21           I believe that the Court is correct that we will have

22  more teachers who do this, and I would ask for a significant

23  sentence so that going forward teachers who are in this unique

24  position realize that it won't be felony D's that they are

25  limited to for exploitation by a counselor or an educator, or

1  perhaps sex abuse third's, in state court.  In the appropriate

2  circumstances, significant penalties, significant penalties,

3  will be imposed.

4         So I believe that this Court's sentence -- I would ask

5  that it provide some general deterrence to the community.  We'd

6  ask that the Court impose 360 months.

7         Thank you, Your Honor.

8         THE COURT:  Mr. Kerndt, are you seeking, then, the JVTA

9  assessment, given that no other restitution has been requested?

10         MR. KERNDT:  No, I am not, Your Honor.

11         THE COURT:  Okay.  And what about the AVAA assessment?

12         MR. KERNDT:  No, I am not, Your Honor.

13         THE COURT:  Okay.

14         Mr. Sarcone.

15         MR. SARCONE:  Thank you, Your Honor.

16         Your Honor, I believe I have thoroughly briefed the

17  issue of sentence in this case.  I do think that there are some

18  sentencing enhancements within the guidelines that are

19  antiquated or outdated that tend to overstate what the sentence

20  should be in this case.

21         Our position is that a sentence closer to 15 years is

22  sufficient, but not greater than necessary, will put Mr. Smith

23  at about 55 years of age or so when he is released.  The

24  literature and statistics suggest that that makes it very

25  unlikely that he would reoffend.

1          He'll be under supervision, I'm sure, for a very long

2   time.  This Court can impose up to lifetime supervision.  This

3   gives an adequate opportunity for rehabilitation.  He will be

4   required to undergo treatment.

5          So our position would be that a sentence nearer the

6   15-year range would be appropriate in this case, and I do

7   believe that Mr. Smith has some things to say, so --

8          THE COURT:  Are there program or placement requests?

9          MR. SARCONE:  Your Honor, he would like to be placed as

10  near as Iowa as possible.  Sandstone or Rochester would be

11  places that he specifically has mentioned.

12         As far as programming, Mr. Smith is anxious to do any

13  kind of programming that he could possibly get into.  I don't

14  think he has a specific -- I know he had at one point mentioned

15  electrician.

16         THE DEFENDANT:  Yeah.

17         MR. SARCONE:  Something that involves, you know,

18  electrical work or electrician would be one thing he would want.

19  But he is interested in doing as much programming as possible

20  while he's in the BOP.

21         THE COURT:  Thank you.

22         Mr. Smith, this is the time in the hearing when you can

23  say what you might want to say to me or the people that are here

24  today.  You don't have to say anything, but is there anything

25  you would like to say?

1          THE DEFENDANT:  Yes, Your Honor.

2          Thank you, Your Honor, and thank you for listening to

3   what I have to say here today.  I've had ample time to find what

4   I believe in my heart are the correct words to express my

5   thoughts and feelings here today.  Unfortunately, I've been

6   unable to do so.  The problem is certainly not a lack of

7   compunction, regret, or remorse, but, rather, inherent

8   limitations of words and their meanings between individuals.

9   Allow me to explain.

10          If I ask you to describe the size of the United States,

11   you might say "big."  If I then ask you to decide -- or, I'm

12   sorry, pardon me -- describe the size of North America, you

13   could say "huge"; earth, "enormous"; the sun, "gargantuan."

14   How, then, would you describe the size of the solar system or

15   the galaxy or the universe?  Eventually we run out of words.

16          On top of that, these words can have different meanings

17   to different people.  When I say "big," your mind may conjure up

18   of the image of a skyscraper or a large city while I'm thinking

19   of a star, and a microbiologist might be thinking of a group of

20   cells.  It's the same word.

21          I say all of this because I want you to understand

22   thoroughly that when I use words like "shame" or "remorse,"

23   "penitence" or "compunction," they are the best that I have

24   within the language, but they are terribly inadequate for how I

25   feel.

1          I stand before you completely ashamed.  I am ashamed of

2   what I've done.  That's the reason why I told my parents and my

3   friends and my family not to be here today.  I don't want them

4   to hear this.  I don't want them to see this.  I am completely

5   ashamed.

6          The thoughts and feelings of remorse and regret I feel

7   are overwhelming and often move me to tears.  The choices I have

8   made have hurt many people, including, but not limited to, those

9   closest to me.  I know what I have done is wrong on multiple

10  levels, and I take full responsibility and accountability for my

11  actions.

12         To my victim, the last message I got from you said that

13  you were sorry.  You have absolutely nothing to be sorry for.

14  Regardless of what you believed your role to be in this, none of

15  this is in any way your fault.  I should have known better.  I

16  should have stopped this before it started.

17         Imagining -- imagining what this must have done over

18  the past year or what capacity it has to impact you in the

19  future causes me a very real pain.  I was supposed to look out

20  for you, and I didn't.  I neglected that duty, and now there is

21  nothing I can do to take it back.  It is my sincerest wish that

22  I may one day find the necessary words to apologize to you

23  appropriately, should you choose to hear them.

24         To the victim's parents, I cannot -- I cannot conceive

25  of the thoughts and feelings you must have.  You entrusted your

1 child to my care, and I betrayed that trust.  As a parent

2 myself, I know that when your child hurts, you hurt, and the

3 knowledge of the pain that I have caused in you torments me.

4 All I can do at this point is to offer a most heartfelt apology.

5 I am so sorry.  I did not mean to hurt your daughter.  I am so

6 sorry.

7        Given what -- given what my position within the

8 community was, my actions have certainly affected more:  former

9 students, particularly those I was more familiar with; parents

10 of those students; former colleagues of mine all must have at

11 some point questioned the motives of everything I had done or

12 said to be helpful to those people.

13        Especially to the parents of former students, I would

14 say I am very, very sorry for any mental anguish I may have

15 caused, but know that, as God is my witness, your fears are

16 unfounded.

17        My own family too has been decimated because of me.  My

18 wife does an excellent job of keeping me in contact with my

19 nearly 5-year-old twin boys.  Samuel and Elias are too young to

20 fully understand what is going on, but that does not stop them

21 from asking when I'm coming home or when my adult timeout, which

22 is how we've phrased it, will be over or countless other

23 heartbreaking questions to which I have no answers.

24        Every visit I have with them illustrates both how much

25 they miss me and how painful it is for them that I cannot be

1   with them.  This is the worst kind of pain.  To know that my

2   child is suffering as a result of my actions is absolutely

3   crushing.  It is a type of pain that I would not wish on

4   anything -- on anyone or anything.

5          I'm not arguing that I don't deserve punishment.  That

6   point is beyond contestation.  But I do wish, with every fiber

7   of my being, that there was a way to punish me without punishing

8   my children.  They have done nothing for which they should be

9   made to grow up without their father, and there is no punishment

10  I would not bear to spare them from that fate.

11         Unfortunately, that is no longer in my power.  I

12  understand I'm about to be sentenced to at least 15 years away

13  from them.  While that is absolutely terrifying, there is no

14  reason I cannot use that time wisely while I'm away.  I plan to

15  continue doing what I've always done, be as helpful as possible

16  to as many as possible.

17         I was a teacher long before it was my job, and I plan

18  to help people learn.  I can teach trade skills.  I can teach

19  them to pass their high school equivalency tests.  I can be a

20  source of good for those people, and I can give them the skills

21  necessary to be productive members of society that they might

22  not have had without them.

23         I also plan to study psychology, money management, and

24  team parenting in the hopes that I may still be able to be an

25  active participant in my children's lives.

1          On top of this, I plan to seek out and participate in

2     every class, program, treatment, or anything else I can do that

3     will help make me stronger in mind, body, and spirit, as well as

4     possibly get me home to my children even one day sooner.

5          Now, as I said in the beginning, words have

6     limitations, and it is my opinion that these words I have used

7     here today, though they are my best, are still woefully

8     inadequate to convey how I feel in my heart.  So invite you now,

9     look in my eyes, and see if there is any meaning that I have

10    failed to convey today.

11         Thank you.

12         THE COURT:  Thank you.

13         In this case I have considered all of the factors under

14    3553(a) and the advisory guidelines and the statutory penalties.

15         We have talked quite a bit through this hearing about

16    what happened.  The defendant, who was then either 38 or 39 --

17    his birthday happens to be right in this three-week window we're

18    talking about -- at the time of this offense was a high school

19    teacher.  He sexually exploited one of his 15-year-old female

20    students.

21         He exchanged volumes of sexually charged messages with

22    her.  He solicited and received sexually explicit photos and

23    videos from her.  He had sex with her on two different

24    occasions.  He videotaped one of those sexual encounters, which

25    led him to federal court for production of child pornography or,

1   as he ended up pleading to, enticement or attempted enticement

2   of a minor.

3           The defendant is 39.  He'll be 40 next week.  He was

4   born and raised in Des Moines.  He's resided, really, in this

5   area his whole life, other than a brief stint in Cedar Rapids

6   while he was at Kirkwood.  His basic needs were met growing up.

7           He's recently divorced.  He has, as he said, the two

8   twin boys from this relationship.

9           Defendant has some back issues but no other physical

10  health problems.  He's struggled with anxiety but no serious

11  mental health problems in the sense -- I don't say anxiety is

12  not serious, but in the sense he's not schizophrenic or bipolar

13  or some of those really, really difficult mental health

14  conditions.

15          Defendant has an aged history of substance abuse back

16  when he was in his twenties.  He hasn't had any substance abuse

17  problems in the last, you know, decade and a half.

18          Defendant graduated from high school.  He ultimately

19  earned his bachelor's degree from Grand View.  He's always been

20  employed in different positions.  He was a science teacher at

21  Southeast Polk High School in Pleasant Hill, Iowa.

22          Defendant's criminal history, aside from this, is a

23  disorderly house conviction when he was 19.

24          This is a very difficult case on many levels.  The

25  defendant's relationship with this 15-year-old girl outside of

1    the confines of the high school teacher-parent relationship

2    would have been illegal.  It would have been troubling.  It

3    would have been disturbing.  But it wouldn't be this degree of

4    pain.  It wouldn't have caused this degree of pain and

5    devastation to this 15-year-old.

6           It is the very nature of the relationship that he had

7    with this child that causes 99 percent of the problems here.

8    Children have to be safe at school.  It's the one safe place a

9    lot of children have.

10          Now, this minor victim had a good, loving, supportive

11   home, but she was vulnerable because she had some mental health

12   struggles of her own, and she went to somebody who had been a

13   mentor to her for help, and it turned into this, and that has

14   had devastating consequences on her life.

15          And while I am hopeful that she will come out of this

16   even stronger than she went into it and that she will find her

17   way back to balance and health, she's been through horrible

18   things, and that is entirely the defendant's fault.

19          And there has to be a message sent that teachers cannot

20   engage in this kind of behavior, that children have to be safe

21   in their environment.  No matter whether she was 17 or 12, this

22   is not acceptable behavior because of the nature of the

23   relationship between the two people and because of the imbalance

24   in power that that brings.

25          In trying to structure a sentence, I have gone back and

1  forth a great deal in my mind.  On the scale of the type of

2  horror that we unfortunately see in this courtroom all the time,

3  but for this relationship between the 15-year-old and the

4  defendant, this would be on the very low end of the scale

5  because, unfortunately, we have to witness in this courtroom

6  parents who sell their children for sex, parents who rape their

7  infant children.

8        We have to witness the kinds of horrors that no child

9  should suffer and that none of us should have to see, but we see

10  it every day in our jobs, and that does harden you in some ways

11  to pain because it becomes this horrible sliding scale of

12  terrible things, and on this sliding scale of terrible things,

13  but for this relationship of parent -- I'm sorry -- a teacher

14  and child, the defendant would be on the low end of the scale.

15  His victim is relatively older.  She was -- had some agency in

16  what was going on, to the extent she was capable of it given the

17  relationship.

18        The problem is that relationship overarches everything,

19  and just like a parent should be punished more harshly than a

20  stranger who hurts their own child, a teacher has to take that

21  hit too, in my view.

22        So ultimately, what I've decided is that the defendant

23  shall remain in prison until his victim is the same age that he

24  was when he did this to her, and that is 24 years.  That's a

25  sentence of 288 months.

1          It is within the same range that would have applied had

2   I not applied the cross-reference.  I would have given this same

3   sentence ultimately after considering all of the factors here,

4   no matter how I would have ruled on that particular

5   cross-reference.  This is a very lengthy sentence, but it is one

6   that, in my view, balances all of the mitigating and aggravating

7   factors involved.

8          I will recommend Defendant be placed at Sandstone or

9   Rochester.

10          He is probably eligible for the RDAP program.  Do you

11   want that?

12          MR. SARCONE:  Yes, Your Honor.

13          THE COURT:  I'll recommend the RDAP program and that

14   Defendant be allowed to participate in electrical training or

15   vocational experiences, if that is his desire.

16          Following this term of supervised -- I'm sorry -- of

17   prison, the defendant will be on supervised release for ten

18   years.  During the defendant's term of supervision, he will have

19   to participate in and follow rules for a sex offense-specific

20   treatment programming.  He'll have to have whatever therapy is

21   recommended.  He'll have to submit to periodic polygraph testing

22   as is laid out more fully in the sentencing order.

23          He may not go to or remain at any place for the primary

24   purpose of observing children under the age of 18 or any place

25   that he knows children are likely to be located -- parks,

1   schools, playgrounds -- without the prior approval of the

2   probation office.

3          He cannot have any direct contact -- personal,

4   electronic, mail, or otherwise -- with any child other than his

5   own that he knows or reasonably should know to be under the age

6   of 18 without, again, approval from the probation office.

7          Defendant may not have access to the Internet or

8   possess or use a computer or Internet-capable devices or cell

9   phones or other electronic communications or data storage

10  devices without prior approval of the probation office.

11         If he is allowed those kinds of devices, he's going to

12  have to agree to periodic inspection of them and the monitoring

13  software that could be installed upon it.  He also will have to

14  agree to have those devices removed as necessary to have more

15  thorough inspections completed if he is allowed to use or

16  possess computers.

17         He has to comply with all sex offender laws in the

18  state in which he ultimately resides.

19         He has our standard search condition, which means the

20  probation office has my authority to search him or his house,

21  his car, his business, his phones, his computers to ensure that

22  he's complying with these terms and conditions of supervision

23  and not otherwise breaking the law.

24         I am also adding a condition that was not discussed in

25  the presentence report.  The defendant is to have no contact

1  with the victim or her family without the prior permission of

2  the probation office.

3         If, at some point, your daughter wants to have contact

4  with the defendant because therapeutically she needs some -- she

5  needs to say something to him, either in writing or email or --

6  she can contact him.  He just can't contact her back without

7  permission.

8         Now, I'm not saying she needs to have that contact.

9  She may never want to talk or think about him again.  But a lot

10  of times as kids this age are going through therapy, it may be

11  recommended that she say something to him, and so I want her to

12  have that opportunity if she needs it, but the defendant may not

13  initiate any contact, may not respond to any letters or e-mails

14  or phone calls that he receives without permission from the

15  probation office.

16         These conditions were imposed as they relate to the

17  defendant's specific and particular needs.

18         I do order forfeiture in this case consistent with the

19  Preliminary Order of Forfeiture filed August 11th of 2021 at

20  Docket 48.

21         I find Defendant does not have the ability to pay a

22  fine, and no fine will be imposed.  No restitution, JVTA, or

23  AVAA is applicable here by request of the Government.

24         There is a $100 special assessment that will need to be

25  paid.

1          Mr. Smith, you have 14 days from today to appeal the

2   sentence I just gave you.  If you decide you want to appeal, let

3   Mr. Sarcone know.  He'll file that paperwork for you.  It won't

4   cost you anything.  And Mr. Sarcone would handle the appeal.

5          Mr. Sarcone, I don't recall, are you appointed in this

6   case?

7          MR. SARCONE:  I am not.

8          THE COURT:  You are retained?

9          MR. SARCONE:  But should Mr. Smith want to file an

10  appeal, then I would pursue being CJA-appointed to it.

11         THE COURT:  Okay.  What that means, Mr. Smith, is if

12  you want to appeal and you can't afford to pay Mr. Sarcone to

13  handle that appeal, he would apply to be appointed to represent

14  you on appeal.  And given the financial information in the

15  presentence report, you would qualify for court-appointed

16  counsel.

17         Mr. Kerndt, I think we have Counts 2 through 4 to be

18  dismissed.

19         MR. KERNDT:  Yes, Your Honor.  The Government so moves.

20         THE COURT:  Those are dismissed.

21         Anything else for the Government?

22         MR. KERNDT:  No, Your Honor.

23         THE COURT:  Mr. Perry, anything for probation?

24         THE PROBATION OFFICER:  Yes, Your Honor.  Just for

25  clarity, in the PSR we have three conditions regarding

1  restitution and financial disclosure.  Given that there is no

2  restitution requested, would you like those removed from the

3  J & C?

4          THE COURT:  Yes.  Those weren't imposed for that very

5  reason.

6          Mr. Sarcone, anything else?

7          MR. SARCONE:  No, Your Honor.

8          THE COURT:  Mr. Smith, do you have any questions about

9  your sentence?

10          THE DEFENDANT:  No, Your Honor.

11          THE COURT:  Okay.  We are adjourned.

12          (Proceedings concluded at 11:02 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

40

<u>C E R T I F I C A T E</u>

I, Kelli M. Mulcahy, a Certified Shorthand Reporter of the State of Iowa and Federal Official Realtime Court Reporter in and for the United States District Court for the Southern District of Iowa, do hereby certify, pursuant to Title 28, United States Code, Section 753, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated at Des Moines, Iowa, this 24th day of November, 2021.

Kelli M. Mulcahy, CSR, RDR, CRR
Federal Official Court Reporter